UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------x

UNITED STATES OF AMERICA,

      v.                                      21 Cr. 681 (NSR)

JACOB CARTER,

            Defendant.

------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF JACOB CARTER'S MOTION PURSUANT TO RULE 29 FOR A JUDGMENT OF ACQUITTAL ON COUNT THREE, TO DISMISS COUNTS TWO AND THREE ON THE GROUNDS THAT THEY DEPRIVED MR. CARTER OF A UNANIMOUS JURY VERDICT, AND IN THE ALTERNATIVE A NEW TRIAL PURSUANT TO RULE 33**

Jill R. Shellow
Law Offices of Jill R. Shellow
15 Chester Avenue
White Plains, NY  10601
(212) 792-4911
jrs@shellowlaw.com

*Attorney for Jacob Carter*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................... 2

BACKGROUND .................................................................................. 3

STATEMENT OF FACTS .................................................................... 6

PROCEDURAL HISTORY ................................................................... 14

JURY INSTRUCTIONS ....................................................................... 15

LEGAL STANDARD ........................................................................... 17

ARGUMENT ..................................................................................... 20

    I.     The Evidence was not Sufficient to Support the Jury's
          Verdict that Mr. Carter Lacked the Lawful Authority to Use
          the Identifying Information of the Applicants for EIDL
          funds ................................................................................... 20

    II.    The Evidence was not Sufficient to Support the Jury's
          Verdict that the Identifying Information Was the "Crux" of
          the Aggravated Identity Theft Charged in Count Three ................... 26

    III.   Counts Two and Three Each Improperly Charged
          More than One Offense and Denied Mr. Carter his
          Constitutionally Protected Right to a Unanimous Jury ..................... 29

    IV.   Mr. Carter Joins the Analyses and Arguments of His Co-
          defendants In their Motions for  Judgments of Acquittal
          and for a New Trial ............................................................... 31

CONCLUSION................................................................................... 31

# TABLE OF AUTHORITIES

**Page**

Cases

*Curley v. United States*, 160 F.2d 229 (D.C. Cir. 1947) ........................................ 19

*Haines v. Kerner*, 404 U.S. 519 (1972) ................................................ 30

*Jackson v. Virginia,* 443 U.S. 307 (1979) ................................................ 6

*Spigelman v. United States*, No. 10 Cv. 7579 (SAS), 2012 WL
    3594304 (S.D.N.Y. Aug. 21, 2012) ................................................ 18

*Sullivan v. Louisiana*, 508 U.S. 275 (1993) ................................................ 20

*United States v. Arguedas*, No. 20 Cr. 135 (JMF), 2021 WL
    5567749 (S.D.N.Y. Nov. 29, 2021) ................................................ 29

*United States v. Blasini-Lluberas*, 169 F.3d 57 (1st Cir. 1999) ................................. 18

*United States v. Coplan*, 703 F.3d 46 (2d Cir. 2012) ........................................ 20

*United States v. Droms*, 566 F.2d 361 (2d Cir. 1977) ........................................ 29

*United States v. Dubin*, 599 U.S. 110 (2023) ........................................ 27, 28

*United States v. Forino*, No. 14 Cv. 979 (DJS), 2015 WL
    13016006 (D. Conn. Oct. 28, 2015) ................................................ 30

*United States v. Glenn*, 312 F.3d 58 (2d Cir. 2002) ........................................ 20

*United States v. Guadagna,* 183 F.3d 122 (2d Cir. 1999) .................................... 18

*United States v. Huezo*, 546 F.3d 174 (2d Cir. 2008) ........................................ 20

*United States v. Jackson*, 335 F.3d 170 (2d Cir. 2003) ...................................... 18

*United States v. Jones*, 393 F.3d 107 (2d Cir. 2004) ........................................ 19

*United States v. Lorenzo*, 534 F.3d 153 (2d Cir. 2008) ...................................... 19

**Page**

*United States v. Matthews,* 20 F.3d 538 (2d Cir.1994) ....................................................... 18

*United States v. Monica*, 295 F.2d 400 (2d Cir. 1961) ....................................................... 18

*United States v. Nicolo*, 523 F. Supp.2d 303 (W.D.N.Y. 2007) ......................................... 29

*United States v. Okparaeke*, No. 17 Cr. 225 (NSR), 2019 WL
    4233427 (S.D.N.Y. Sept. 6, 2019) ...................................................................... 31

*United States v. Reyes*, 302 F.3d 48 (2d Cir.2002) ............................................................ 18

*United States v. Rodriguez*, 392 F.3d 539 (2d. Cir. 2004) ................................................. 19

*United States v. Simmons*, No. 08 Cr. 1280 (VEC), 2020 WL
    6381805 (S.D.N.Y. Oct. 29, 2020) ...................................................................... 30

*United States v. Spears*, 729 F.3d 753 (7th Cir. 2013) ..................................................... 28

*United States v. Spinney*, 65 F.3d 231 (1st Cir. 1995) ...................................................... 18

*United States v. Sturdivant*, 244 F.3d 71 (2d Cir. 2001) .................................................. 29

*United States v. Taylor*, 464 F.2d 240 (2d. Cir. 1972) ...................................................... 18

*United States v. Thrower*, 584 F.3d 70 (2d Cir. 2009) ...................................................... 30

*United States v. Urena*, 73 F. Supp. 3d 291 (S.D.N.Y. 2014) ........................................... 18

<u>Statutes</u>

18 U.S.C. § 2 ...................................................................................................................... 2

18 U.S.C. § 1028A(a)(1) ..........................................................................................3, 17, 27

18 U,S,C, § 1343 ............................................................................................................... 2

18 U.S.C. § 1347 .............................................................................................................. 27

18 U.S.C. § 1349 ............................................................................................................... 2

Coronavirus Aid, Relief, and Economic Security Act,

**Page**

Pub. L. No. 116-136, 134 Stat. 235 ........................................................................... 4

Rules

Rule 8(a), Fed. R. Crim. P. ...................................................................................... 29

Rule 12(b)(3)(B)(i), Fed. R. Crim. P. ...................................................................... 30

Rule 12(c)(3), Fed. R. Crim. P. ................................................................................ 30

Rule 29, Fed. R. Crim. P. .......................................................................................... 14

Rule 29(a), Fed. R. Crim. P.  .................................................................................... 17

Other Authorities

https://www.governor.ny.gov/news/governor-cuomo-signs-
    new-york-state-pause-executive-order  ........................................................ 4

https://www.sba.gov/funding-programs/loans/covid-19-relief-
    options/paycheck-protection-program/ppp-loan-forgiveness .................... 5

https://www.sba.gov/document/report-22-01-sba-emergency-
    eidl-grants-sole-proprietors-independent-contractors ................................ 5

https://home.treasury.gov/system/files/136/PPP--Fact-Sheet.pdf...................... 5

https://www.irs.gov/businesses/small-businesses-self-employed
    /sole-proprietorships  ..................................................................................... 21

https://www.irs.gov/businesses/small-businesses-self-employed
    /independent-contractor-defined  ................................................................ 21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------x

UNITED STATES OF AMERICA,

     v.                                           21 Cr. 681 (NSR)

JACOB CARTER,

        Defendant.

-------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF JACOB CARTER'S MOTION PURSUANT TO RULE 29 FOR A JUDGMENT OF ACQUITTAL ON COUNT THREE, TO DISMISS COUNTS TWO AND THREE ON THE GROUNDS THAT THEY DEPRIVED MR. CARTER OF A UNANIMOUS JURY VERDICT, AND IN THE ALTERNATIVE A NEW TRIAL PURSUANT TO RULE 33

Jacob Carter moves pursuant to Rule 29, Fed. R. Crim. P., for a Judgment of Acquittal on Count Three, Aggravated Identity Theft in violation of 18 U.S.C. § 1028A on two grounds.[1]

First, the Government failed to prove that the identities of others were used without authority or knowledge. The three witnesses who testified made clear that they willingly provided their names, social security numbers, bank account information, and other personal identifiers and that they understood the purpose was to engage Mr. Carter to obtain funds for them from the Small Business Administration's Economic Injury Disaster Loan program. The Government contends

---

[1] On February 8, 2024, at the close of the Government's case, Mr. Carter moved orally *pro se* for a Judgment of Acquittal. His motion was denied. Mr. Carter also filed a written motion for the same relief. This motion supplements Mr. Carter's *pro se* applications.

that the use of their information was contrary to law and labeled the witnesses as "victims" who did not consent to the use of their information. Each witness testified that they affirmatively sought $10,000 from the SBA and that they paid Mr. Carter and others to secure these funds on their behalf. The jury's question during deliberations recognized this flaw in the Government's proof.

Second, the Government failed to prove that obtaining and using the identity information of others was the "crux" of the illegal conduct. Assuming, *arguendo*, that the Government has proven the elements of conspiracy or wire fraud, the identity of each individual who made an application was incidental to the SBA's approval of their applications for funding.

In addition, Mr. Carter moves to dismiss Counts Two and Three because each is duplicitous, *i.e.*, each count combines more than one distinct crime into a single count thereby depriving Mr. Carter of a unanimous jury verdict and adopts the analyses set forth in his co-defendant Quadri Salahuddin's motion to dismiss.

Finally, in the alternative, Mr. Carter moves for a new trial pursuant to Rule 33 for an order vacating the judgment and granting a new trial in the "interests of justice."

## PRELIMINARY STATEMENT

On February 9, 2024, following a week-long trial, a jury found Jacob Carter guilty of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 (Count One of the Indictment), substantive wire fraud in violation of 18 U.S.C. §§ 1343 and 2

2

(Count Two of the Indictment); and aggravated identity theft in violation of 18 U.S.C

§§ 1028A(a)(1) and 2 (Count Three of the Indictment).  The jury also convicted Mr.

Carter's co-defendants Quadri Salahuddin and Anwar Salahuddin of the same

offenses.[2]  The defendants were all *pro se* and assisted by standby counsel.  The

gravamen of the conduct related to an alleged fraud to obtain funds during the

period from March to July 2020 – during the early days of the COVID-19 pandemic –

from The Small Business Administration ("SBA") and specifically its Economic Injury

Disaster Loan ("EIDL") program.  The EIDL program provides funding to small

businesses impacted by disasters such as hurricanes, fires and floods so that they

can meet the ordinary and necessary expenses of running the business.  Tr. at 508-

509.[3]

## BACKGROUND

The Government charged Mr. Carter and his co-defendants with a conspiracy

to defraud the SBA that started in March 2020.  March 2020 was a lifetime ago.  To

put this time period in historical context:  Joe Biden had won the democratic

primary in South Carolina and was well on his way to clinching his party's

---

[2] Messrs. Salahuddin are brothers.  A third brother's name also appears in the record, Kafele Salahuddin.  For convenience, whenever one of the Salahuddin siblings is referred to herein, only his given name is used.

[3] Citations to the record are to the trial transcript ("Tr.").  Unless otherwise noted, for clarity, all internal quotation marks, alterations and citations have been omitted from cited sources.

nomination for President.  Harvey Weinstein was sentenced to 23 years in prison for rape.  And on March 11, 2020:

- Dr. Anthony Fauci, testifying before Congress about the spread of the Coronavirus, announced that the worst was yet to come;

- Tom Hanks and his wife posted to Instagram that he and his wife were sick with the virus – now commonly referred to as COVID-19; and

- President Donald Trump announced a 30-day ban on travel from European countries to the United States that would starting at midnight on March13.

On March 20, 2020, Governor Andrew Cuomo signed the "New York State of Pause" Executive Order closing down 100% of all non-essential businesses statewide effective 8PM on Sunday, March 22, 2024.[4]  On March 27, 2020, Congress passed and then-President Donald Trump signed the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-135, 134 Stat. 285 ("the CARES Act").

The CARES Act introduced the Paycheck Protection Program ("PPP loan") with the goal of preventing job losses and small business failures caused by the COVID-19 pandemic.  The PPP loan program was available to eligible small businesses, including sole proprietors, nonprofits, veterans' organizations and tribal

---

[4] https://www.governor.ny.gov/news/governor-cuomo-signs-new-york-state-pause-executive-order (last visited Aug. 30, 2024).

businesses to provide a forgivable loans to cover payroll and other costs.[5]  The CARES Act also provided additional funding for the EIDL program and allowed the SBA to make emergency EIDL grants of $1,000 per employee to sole proprietors and independent contractors up to $10,000.[6]  Tr. at 512-514, 521.

PPP applications were processed by approved lenders.[7]  The EIDL application process was all online.  Tr. at 510, 517.  The application for EIDL grants required an applicant to verify its eligibility by stating that  (1) the applicant was an "individual who operates under a sole proprietorship, with or without employees, or an independent contractor;" (2) the applicant was "not engaged in any illegal activity;" (3) "no principal of the applicant ... is more than 60 days delinquent on child support obligations;" (4) the applicant does not present live performances of a prurient sexual nature or derive more than *de minimis* gross revenue through the sale of products or services, or the presentation of any depictions or displays of a prurient sexual nature;" (5) the applicant "does not derive more than one-third of gross annual revenue from legal gambling activities;" (6) the applicant "is not in the business of lobbying;" and (7) the applicant is not a state, local or municipal Government entity and not a member of Congress.  *See, e.g.*, GX 2.  The application

---

[5] *See* https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/ppp-loan-forgiveness (last visited Aug. 30, 2024).

[6] *See* https://www.sba.gov/document/report-22-01-sba-emergency-eidl-grants-sole-proprietors-independent-contractors (last visited Aug. 30, 2024).

[7] *See* https://home.treasury.gov/system/files/136/PPP--Fact-Sheet.pdf (last visited Aug. 30, 2024).

specifically contemplated that applicants would receive help to complete the application, and there was space to identify such an agent, "the fee charged or agreed upon" and whether the SBA had the applicant's permission to discuss the application with this person. *Id.* Unlike other information in the application, however, applicants were not required to disclose whether they received help in completing the application. Tr. at 526.

### STATEMENT OF FACTS[8]

The evidence at trial showed that Mr. Carter and his co-defendants informed many people about the availability of the EIDL grants. Three people testified that after learning about the grants that they freely provided their information to the defendants so that the defendants could prepare and submit applications on their behalf. Rodney Samson provided his information to Quadri. Darius Cousart provided his information to Anwar, and Ousman Jobe provided his information to Mr. Carter. For introducing applicants to the availability of the $10,000 grant, these applicants agreed to pay the defendants a referral fee of $1,000 and a processing fee of $3,000. In sum, the applicant each kept more than 50% of the grant proceeds.

The first applicant to testify was Rodney Samson. Samson had been a captain working for the Mt. Vernon Fire Department for more than 25 years. Tr. at 635-636. Samson learned about "a COVID-19 grant program in the summer of 2020 from

---

[8] The facts are set forth "in the light most favorable to the prosecution." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979).

members of the fire department." *Id.* Samson understood that the program was a

"stimulus for people that had worked through COVID" and that the Fire Chief's son,

Quadri Salahuddin, was "filling out the applications for members." Tr. at 636.    The

Chief gave Samson Quadri's phone number.  Tr. at 639. And Samson "reached out" to

Quadri.  Tr. at 641.  There was no specific discussion about whether Samson was

eligible for the funding.  It was "don't ask, don't tell."  On direct examination, the

prosecutor asked:

> Q.    What did you and Quadri discuss about who was eligible
>        for the COVID-19 program?
>
> A.    When I first reached out to him, I basically had the
>        conversation based on me being a first responder.  *It was
>        to my understanding* that I was almost guaranteed to
>        receive it, being that I was a firefighter and first responder.
>
> Q.    What, if anything, did Quadri tell you about who was
>        eligible for the program?
>
> A.    To my recollection, it was *the fact that I was a first
>        responder basically was the topic of the conversation*.

Tr. at 641-642 (emphasis added).

In order to complete the application, Quadri asked Samson for his "name, age,

telephone number, address, Social Security number, and my banking routing and

banking account number."  Tr. at 642-644.  Although Samson was at first "hesitant"

to share his social security number, his fears were allayed when Quadri said that the

information would be deleted after the application was processed.  Tr. at 642-643,

657.  Samson did not recall whether Quadri asked Samson whether he owned a

business or had any employees, Tr. at 644, and Samson did not tell Quadri that he had a business or employees.  Tr. at 653.  After Samson received $10,000 from the SBA, Samson paid $3,000 to Quadri.  Tr. at 645.

Samson recalled Quadri asking Samson if he knew anyone else who would want to apply.  Samson said that his wife, son and oldest daughter were interested in applying.  Samson's wife talked to Quadri and gave Quadri her own information; Samson provided Quadri with information for his son and daughter.  Samson's son worked part-time at a pharmacy; Samson's daughter worked in a doctor's office.  Tr. at 646.  Quadri did not tell Samson that his family members would qualify for the money, but he said that he "would process the loan and would see if they would get it or not…. It was just we'll put it in and see what happens, basically."  Tr. at 647.  The SBA approved grants to Samson's children, but not his wife.  Tr. at 649.  Samson recalled that he talked to Quadri about being a first responder, but there is no evidence that Samson made any inquiry about whether he and his family qualified for the EIDL grant.  Samson just assumed that they were qualified because he heard "several guys" talking about the EIDL program.  Tr. at 658.  On cross-examination, Samson testified that his identity had not been stolen. Tr. at 657.  Samson and his family received $30,000 from the SBA EIDL Program.  They kept $21,000 and paid Quadri $9,000.  Samson testified pursuant to a non-prosecution agreement.  Tr. at 655. Samson's wife did not testify.

8

The second applicant to testify was Darius Cousart. Cousart is an architect. Anwar and Cousart are skateboard buddies; they had been skateboarding together since they were both teenagers. Tr. at 1248. In 2020, while the New York State was otherwise closed down, Cousart saw Anwar approximately twice a week. Tr. at 1248. Cousart learned about the EIDL program from Anwar when they were together with other people on a playground where they skated. Tr. at 1254. They had three conversations about the EIDL program. Tr. at 1289. The only specifics that Cousart could recall about their conversations were related to the fees and that the EIDL funds did not have to be repaid. Tr. at 1255-1256. Cousart could not recall whether Anwar "mentioned details regarding the grant." Tr. at 1291.

Cousart understood that he could receive $10,000. He would need to pay the person who submitted the application $3,000, and he would have to pay Anwar a $1,000 referral fee. Cousart knew that he would keep $6,000. Tr. at 1255-1256. At some point, when Cousart was leaving the playground, Anwar introduced Cousart to "Jacob" and said that Jacob was the person who was receiving the $3,000 fee. Tr. at 1260. Cousart recalled that during his conversation with "Jacob," they talked about the same things that Anwar had previously told Cousart and the fees. Cousart recalled that Jacob "briefly mentioned that he used to work in finance, some kind of finance." Tr. at 1260, 1293. Cousart could not recall whether "what the money could be used for was repeated in that conversation." Tr. at 1293. There is no evidence that Cousart asked Anwar or "Jacob" about whether he would be qualified to receive

the EIDL funds.  Cousart "didn't really think much of it."  Tr. at 1263.  Cousart

assumed  that because there were "different social like ... different programs going

on where it was like grants and things being given out" that he was eligible.  Tr. at

1263, 1294.  Cousart testified that he did not know that the application called for

information about his business and employees and that had he known this

information was required he would not have made the application.  Tr. at 1284-

1286.  But there is no evidence that Cousart asked about his eligibility, or did any

research of his own.  Again, "don't ask, don't tell."  Cousart testified pursuant to a

non-prosecution agreement.  Tr. at 1286, 1297.   There is no evidence that Cousart

was required to return the funds to the SBA.  Cousart testified that he had not been a

"victim of identity theft."  Tr. at 1305.

　　　The third applicant to testify was Ousman Jobe.  Jobe was the only applicant

who was required to plead guilty.  Jobe and the Government entered into a

cooperation agreement and as part of that agreement, Jobe pled guilty to conspiracy

to commit wire fraud, wire fraud and aggravated identity theft.[9]  798.  Briefly, Jobe

---

[9] The record of Jobe's guilty plea is unclear because when Jobe appeared before
Magistrate Judge Andrew E. Krause to change his plea on January 19, 2024, there was a
problem with the recording.  Part of the January 19 proceeding was not recorded.  The
guilty plea proceeding was continued on January 31, 2024 with a court reporter present.

　　　During Mr. Carter's trial, on cross-examination, Tr. at 819, Jobe acknowledged that
when he pled guilty on January 19, 2024 he allocuted as follows:

> Q.　　Please tell me in your own words what did – what you did to
> commit these crimes.

A.       "I conspired with two gentlemen that knew about, un, let's say wire fraud and the essence of that nature.  They knew how to like transfer money from the SBA organization to, you know, just pretty much people's bank accounts, stuff of that nature.  So, I just joined in with the wire fraud aspect of what they were doing. And I knew that —I – was unlawful authority – that it was unlawful authority, but I just proceeded anyway to – I used to – I used the names and identifications of other individuals to submit the applications without lawful authority."

On January 31, the following colloquy took place:

THE COURT:  Please tell us what you did to commit these crimes.

THE DEFENDANT:  Yes.  I prepared the EIDL applications to then give them wealth and money to their checkings accounts, and I did it with Jacob Curry and a few other people. I was referring people to also get -- to get -- to get money wired to our checkings accounts as well through the SBA applications, which is the EIDL program.

THE COURT:  Okay.  When you say "EIDL," you are referring to EIDL, the Economic Injury Disaster Loan Program; is that correct?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  And in doing this, Mr. Jobe,  did you possess the identification information of other people in order to submit these applications?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  I am sorry.  I believe you said this, but you said you submitted these over –   these applications over the internet; is that   correct?

THE DEFENDANT:  Yes.  I used the Brave browser,  yes.

THE COURT:  And when you had this  identifying information, identification information of other people, you -- and used that information, you did not have the lawful  authority to do that; is that correct?

THE DEFENDANT:  Yes.  Yes, Your Honor.

THE COURT:  Let me ask you this once more,  Mr. Jobe. Did you  know

has an associate's degree in liberal arts and served in the Navy for four years.  Kafele

Salahuddin told Jobe about the EIDL program.  Tr. at 732.   Kafele told Jobe that the

EIDL program was "an advance you can sign up for and you get a grant for $10,000."

Tr. at 734.  Jobe was excited and said to Kafele, "just let me know what I need to do."

Kafele introduced Jobe to Mr. Carter.  Mr. Carter explained to Jobe the difference

between an EIDL loan and an EIDL advance and told Jobe  that he had to own a

business to apply for an EIDL advance."  Tr. at 736-737.  Mr. Carter explained "if you

owned a business, at the same time, you are basically a sole proprietorship, so you

own – you are the business by your name and your last name."  *Id.*   Mr. Carter

explained the fee structure – Mr. Carter would get $3,000 to process the application,

---

that it was against the law to do what you were doing?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And where were you when did you these things?

THE DEFENDANT:  I was in my residence, at my home, Your Honor.

THE COURT:  And that was in Mount Vernon, New York, correct?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And can you just tell us when that was that these applications and this conduct – the applications were submitted and this conduct was  undertaken?

THE DEFENDANT:  Between May of 2020 to September of 2020, Your Honor.

Transcript, Ousman Jobe Guilty Plea Proceedings, Jan. 31, 2024  (Vol. 2) at 6-8.  The Government produced this transcript to Mr. Carter as Jencks Act material as GX 3503-30, however neither the January 19 nor the January 31 transcript was made part of the record in Mr. Carter's trial.

Kafele would get $1,000 as a referral fee, and Jobe would keep $6,000.  Tr. at 739-

740.  Jobe did not own a business.  Nonetheless, Jobe gave Mr. Carter his date of

birth, social security number, bank routing and bank account number so that he

could apply for an EIDL loan and advance.  The SBA did not approve Jobe's loan

application, but sent Jobe the $10,000 grant the day after Jobe's application was

submitted.  Tr. at 748.  Jobe was "excited" by the prospect of making money to refer

people to apply for the EIDL funds, especially when Jobe saw that Anwar was

making "a lot of money with the SBA EIDL grant program."  Tr. at 754-755.   Jobe

referred four people to Mr. Carter who applied for EIDL grants, and Jobe collected

$4,000 from each.  Jobe gave Mr. Carter $3,000, kept $1,000 for himself, and the

applicant kept the remaining $6,000.  Tr. at 759, 762.

From May to September 2020, Jobe and Mr. Carter communicated often.  Tr. at

767.  In July 2020, Mr. Carter instructed Jobe on how to submit applications to the

SBA.  Tr. at 768.  Jobe filed six applications on behalf of others, and for every

application that Jobe filed, Joe and Mr. Carter divided the fees equally.  Jobe would

get $2,000, and Mr. Carter would get $2,000. Tr. at 768 -769.  Jobe did not ask

applicants about their businesses because "as Jacob described to me that everyone

basically is a business owner based off their name."  Tr. at 770.  Jobe knew that filing

false applications was wrong, but he did it anyway because "everyone that was

involved doing it was doing it, so I just continued myself to do it.  I didn't really –

that's why."  Tr. at 771.  With Jobe it was not a "don't ask, don't tell."  Rather, there

was no need to ask.  "If everyone else was signing up for this application, I just said, if they were getting money from it, I'll just sign up too, and since they were – since they got that money, I was interested in getting it too."  Tr. at 738.

Jobe's attitude changed when the FBI visited him.  Under the FBI's direction, Jobe placed two calls to Mr. Carter that were recorded.  *See* GX 604 and 604-T.  Mr. Carter did not say anything in the recorded calls that contradicted Jobe's account of the events.  The only additional information to come out of the calls was (1) that Mr. Carter knew that the FBI was investigating him, and (2) that Mr. Carter "wanted people to be helped with the EIDL grant …. He wanted to make sure people at least got money during the COVID relief."  Tr. at 797.

## PROCEDURAL HISTORY

On February 8, 2024, at the close of the Government's case, Mr. Carter orally moved for a judgment of acquittal pursuant to Rule 29, Fed. R. Crim. P.:

> Mr. Carter moves to dismiss each of the three counts on the indictment under Rule 29 of the Federal Rules of Criminal Procedure on the grounds that the government has failed to establish that Mr. Carter is guilty of any element of the charges. The government has not presented a prima facie case as to any count. The government has not proved the charge of aggravated identity theft because they have not established that anyone's identity was used without lawful authority. The government has also not proved the charge of conspiracy to commit wire fraud nor wire fraud due to lack of verifiable information or any firsthand witness.

Tr. at 1591.

14

The Government opposed the motion, and after reciting the elements of each of the charged offenses argued that "the evidence in this case has been overwhelming and, at a minimum, a reasonable mind could fairly conclude guilt beyond a reasonable doubt at this stage." Tr. at 1595. The Court denied the motion finding that "the evidence is sufficient to make out each and every element of the charged crimes." Tr. at 1596.

Subsequently, Mr. Carter filed *pro se* a written motion for a Judgement of Acquittal. The motion was dated February 2, 2024 and was docketed on February 27, 2024. *See* Dkt. Entry #175. This motion supplements both of Mr. Carter's *pro se* applications.

## JURY INSTRUCTIONS

In relevant part, the Court's instructions to the jury on Count Three were:

> In order to prove the defendant guilty of aggravated identity theft, the government must establish beyond a reasonable doubt the following three essential elements:
>
> First, that the defendant knowingly used or transferred or possessed a means of identification of another person;
>
> Second, that the defendant used the means of identification during and in relation to the offense of wire fraud as charged in Count Two or conspiracy to commit wire fraud as charged in Count One; and,
>
> Third, that the defendant acted without lawful authority or, in the alternative, that the defendant aided and abetted others to do the same.
>
> The first element the government must establish beyond a reasonable doubt is that the defendant knowingly used or

transferred or possessed a means of identification of another person.

The term means of identification means any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any name, Social Security number, date of birth, official state or government-issued driver's license or identification number, alien registration number, government passport number or employer or taxpayer identification number or unique biometric data, such as fingerprint, voice print, retina or iris image or other unique physical representation or a unique electronic identification number, address or routing code or electronic serial number or any other number or signal that identifies a specific telecommunications instrument or account or a specific communication transmitted from a telecommunications instrument.

In addition, the government must prove both that the means of identification was that of an actual person, living or dead, and that the defendant knew that the means of identification was that of an actual person.

To act knowingly means to act voluntarily and intentionally and not by mistake or accident. I had instructed you earlier on the manner of proof you may consider when making a decision about the defendant's state of mind. Those same instructions apply to your decisions here in determining whether the defendant acted knowingly with respect to his use, transfer or possession, if any, of a means of identification of another person.

The second element that the government must prove beyond a reasonable doubt is that the defendant used or transferred or possessed the means of identification during and in relation to the offense of wire fraud as charged in Count Two or conspiracy to commit wire fraud as charged in Count One.

A defendant uses a person's means of identification during and in relation to the offenses of either wire fraud charged in Count Two of the indictment or wire fraud conspiracy charged in Count One of the indictment when the use of the means of another

person's identification is at the crux of what makes that conduct criminal. Put differently, the use of a means of identification of another person cannot merely be ancillary to what makes the conduct charged in Count One of the indictment or Count Two of the indictment fraudulent. Instead, in connection with Count One or Count Two, the means of identification specifically must be used in a manner that is fraudulent or deceptive.

The third element that the government must prove beyond a reasonable doubt is that the defendant acted without lawful authority.

The term without lawful authority does not require that the means of the identification be stolen or taken without the owner's permission. Instead, 18 U.S.C. Section 1028A reasonably proscribes the transfer, possession or use of another person's means of identification, absent the right or permission to act on that person's behalf in a way that is not contrary to the law. In other words, regardless of how the means of identification is actually obtained, if its subsequent use breaks the law -- specifically, during and in relation to the commission of the crime of wire fraud or conspiracy to commit wire fraud -- it is violative of 18 U.S.C. Section 1028A.

Tr. at 1766-1769.

## LEGAL STANDARD

"The court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Rule 29(a), Fed. R. Crim. P.

A district court can enter a judgment of acquittal on the grounds of insufficient evidence only if, after viewing the evidence in the light most favorable to the prosecution and drawing all reasonable inferences in the government's favor, it concludes no rational trier of fact could have found the defendant guilty beyond a reasonable doubt."

17

*Spigelman v. United States*, No. 10 Cv. 7579 (SAS), 2012 WL 3594304, at *7 (S.D.N.Y. Aug. 21, 2012), *citing United States v. Reyes*, 302 F.3d 48, 52 (2d Cir.2002). This Court "…must analyze the pieces of evidence 'not in isolation but in conjunction,' *United States v. Matthews,* 20 F.3d 538, 548 (2d Cir.1994), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others." *United States v. Guadagna,* 183 F.3d 122, 130 (2d Cir. 1999) *citing United States v. Monica*, 295 F.2d 400, 401 (2d Cir. 1961). *See also United States v. Reyes,* 302 F.3d at 53 (2d Cir.2002). *United States v. Urena*, 73 F. Supp. 3d 291, 297 (S.D.N.Y. 2014).

While the defendant bears a "heavy burden" when challenging the sufficiency of the evidence, *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003), the burden is not insurmountable. The Court is required to "take a hard look at the record and to reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative." *United States v. Blasini-Lluberas*, 169 F.3d 57, 62 (1st Cir. 1999). "Juries do not have carte blanche." *Id.* *quoting United States v. Spinney*, 65 F.3d 231, 234 (1st Cir. 1995). As the Second Circuit observed in *United States v. Taylor*, 464 F.2d 240 (2d. Cir. 1972):

> The functions of the jury include the determination of the credibility of witnesses, the weighing of the evidence, and the drawing of justifiable inferences of fact from proven facts. It is the function of the judge to deny the jury any opportunity to operate beyond its province. The jury may not be permitted to conjecture merely, or to conclude upon pure speculation or from passion, prejudice or sympathy. The critical point in this

boundary is the existence or non-existence of reasonable doubt as to guilt. If the evidence is such that reasonable jurymen must necessarily have such a doubt, the judge must require acquittal, because no other result is permissible within the fixed bounds of jury consideration. But if a reasonable mind might fairly have a reasonable doubt or might fairly not have one, the case is for the jury, and the decision is for the jurors to make. The law recognizes that the scope of a reasonable mind is broad. Its conclusion is not always a point certain, but, upon given evidence, may be one of a number of conclusions. Both innocence and guilt beyond a reasonable doubt may lie fairly within the limits of reasonable conclusion from given facts. The judge's function is exhausted when he determines that the evidence does or does not permit the conclusion of guilt beyond a reasonable doubt within the fair operation of a reasonable mind.

The true rule, therefore, is that a trial judge, in passing upon a motion for directed verdict of acquittal, must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion; or, to state it another way, if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt, the motion must be granted. If he concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, he must let the jury decide the matter. (footnotes omitted)

*Id.* at 243, *quoting Curley v. United States*, 160 F.2d 229, 232-233 (D.C. Cir. 1947). *See also United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) ("Specious inferences are not indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty") *citing United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004); *United States v. Rodriguez*, 392 F.3d 539, 544 (2d. Cir. 2004);

*Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993) (emphasis in *Sullivan*).

Moreover, if the evidence "viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Coplan*, 703 F.3d 46, 69 (2d Cir. 2012); *United States v. Huezo*, 546 F.3d 174, 193 (2d Cir. 2008); *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002). In other words, where the evidence is "in equipoise," a judgment of acquittal is required. *United States v. Coplan,* 703 F.3d at 69.

## ARGUMENT

### I.    The Evidence was not Sufficient to Support the Jury's Verdict that Mr. Carter Lacked the Lawful Authority to Use the Identifying Information of the Applicants for EIDL funds

To be clear, the three people who testified at trial – who applied for and received EIDL advances – authorized Mr. Carter and his co-defendants to use their names, addresses, social security numbers, and banking information to obtain funds for them from the Small Business Administration.  They were not victims of identity theft.  Mr. Carter and his co-defendants first told these people about the EIDL program.  After that, as contemplated by the EIDL application process, these people engaged Mr. Carter to process their applications and rewarded those who told them about the program with a referral fee.  They willingly provided their identifying information to Mr. Carter and his co-defendants and gave them permission to use

this information in exchange for receiving $10,000.  Mr. Carter did not misappropriate their identifying information.

Recall that the EIDL grant program was not limited to businesses.  As the application form stated, an "individual who operates under a sole proprietorship, with or without employees, or an independent contractor" was eligible to receive funding.  *See* GX 2.  "A sole proprietor is someone who owns an unincorporated business by themselves."  *See* https://www.irs.gov/businesses/small-businesses-self-employed/sole-proprietorships.[10]  An independent contractor is a self-employed person who offers their services to the general public and is not controlled by an employer.  *See* https://www.irs.gov/businesses/small-businesses-self-employed/independent-contractor-defined.[11]  The Government focused its proof and arguments on whether Mr. Carter discussed with the applicants that the applicant had to own a business or employed people in order to qualify for funding.  *See, e.g.,* Tr. at 1618 (summation).  In so doing, the Government led the jury to believe that owning a business or employing people was necessary to qualify for EIDL funding.  The Government failed to credit Mr. Carter's explanation that an applicant could be qualified in one's own  name for EIDL funding either as a sole proprietorship or independent contractor.

---

[10] Last visited Sept. 1, 2024.

[11] Last visited Sept. 1, 2024.

Thus, while Samson and Cousart both testified that had they known that the EIDL program funds were for business owners they would not have submitted applications, neither of them took any steps to investigate their eligibility. Had they done so, they would have discovered that sole proprietorships and independent contractors were eligible as well. Instead, Samson assumed that because he was a first responder – which no one questions – he qualified for the program. But there was no evidence that Samson learned of the program as a result of his employment, or through a professional association. Samson learned about the program because Quadri's father was his boss, and if it was good enough for the boss' son, it must be good enough for him (and for his son, daughter and wife). Cousart is an architect, and as such his work requires familiarity with governmental regulatory schemes. Nonetheless, Cousart applied for the EIDL funds on the assumption that he qualified. There is no evidence that he took any steps to investigate his eligibility, or to inquire beyond what his skateboard buddy had told him.

Mr. Carter told Jobe that the program was for business owners without clarifying that an applicant could also qualify as a sole proprietor or an independent contractor. Nonetheless, Jobe not only made an application in his own name, but he also referred four other people and processed applications for another six people without disclosing to them even the minimal information that he had learned from Mr. Carter.

22

The jury recognized that because each of these witnesses authorized the use of their information there was a fatal flaw in the Government's proof.  During deliberations, the jury sent one note to the Court:  "We would like clarification on Count Three, aggravated identity theft:  How does this count apply if people willingly limiting [sic] provided their own personal information and 'should' have done due diligence on what the information was being used for?  *See* Court Ex. #1; Tr. at 1791. The following colloquy ensued:

> THE COURT: What's the government's answer with respect to the answer to the question? I don't believe that the statute talks about due diligence.  The question is, "does this count apply if people willingly provided their own personal information and should have done" the answer, from what I understand the law, is yes.

> MR. COFFMAN: So the answer to their question, I think, the elements do not consider that question. It's not necessary that they make any finding about whether people should have done due diligence, did due diligence, but I don't know that the Court should answer their question as opposed to just refer them to the instructions.

> THE COURT: Mr. Carter.

> DEFENDANT CARTER: Mr. Carter gave specific notes regarding this matter and what was -- hold on one second. And I believe I submitted a specific instruction on this count and that could be used to give to the –

> THE COURT: The instructions have already been given. I'm not going to modify the instruction. There's no reason to modify the instruction. The only question is how do you propose that the Court respond to the question that's been given to it by the jury?

> DEFENDANT CARTER: I think the jury let the jury know it is a valid question.

THE COURT: Anything else?  Part of their inquiry has nothing to do with whether or not the individuals that provided the information should have done due diligence. It's not part of the statute.

DEFENDANT CARTER: The jury appears to be clearly confused about this count, so we ask you utilize the instruction we provided regarding this count.

THE COURT: Your proposed instruction?

DEFENDANT CARTER: Correct.

THE COURT: Anything else from the Quadri Salahuddin?

DEFENDANT QUADRI SALAHUDDIN: Sorry, one second. I think the jury should be brought out and be read the instructions again in court. The aggravated identity theft, specifically.

THE COURT: Anything from Mr. Anwar Salahuddin?

DEFENDANT ANWAR SALAHUDDIN: No.

THE COURT: My understanding of the statute is that the question that's posed, "How does this count apply if people willingly provided their own personal information and 'should' have done due diligence on what the information was being used for." The government's proposal is what? Just so -- I want some clarification?

MR. COFFMAN: To merely refer the jury to the instructions that the Court gave.

THE COURT: All right. I'll give them the instruction one more time. I'll instruct them on the elements of aggravated identity theft. My interpretation of the statute is that this is not really an issue that they need to be concerned with.

MR. COFFMAN: I think your Honor is correct.

THE COURT: Okay. All right, let's bring out the jurors.

24

(In open court; jury present)

THE COURT: Please be seated. Welcome back. Just so that you are aware, the Court, meaning I, read into the record the note which you provided the Court. It's signed juror number 8. It would be helpful if juror number -- not only we get the jury number but also your proper name, to the extent we get another jury note or any correspondence from the jurors.

So the note reads as follows: "We would like clarification on Count Three, aggravated identity theft. "How does this count apply if people willingly apply their own personal information, and 'should'" is in quotation marks, "have done due diligence on what the information was being used for."

What I'm going to do in response to that question is I'm going to instruct you once more on the elements that must be proven with respect to Count Three, aggravated identity theft. These are the elements that you have to determine whether or not the government has established the three elements beyond a reasonable doubt. That is the only thing that you're considering, did the government establish beyond a reasonable doubt these three elements.

Tr. at 1791-1795. The Court then proceeded to read the same instruction as originally given. *See* 15-17, *supra*; Tr. at 1795 – 1799. But the instruction left the jury's question unanswered.

By letter emailed on February 6, 2024 – Mr. Carter through stand-by counsel – asked the Court for a jury charge that included the following language as part of the third element of the aggravated identity theft charge in Count three: "If, after scrutinizing the evidence in this case, you conclude that you have a reasonable doubt as to whether the persons whose identity was used authorized the use of their

identity, you must find the defendant not guilty."[12]  The Court refused to include Mr.

Carter's request in the jury charge.  Mr. Carter's proposed  instructions addressed

the precise question posed by the jury, and the Court refused again to instruct the

jury with Mr. Carter's proposed language in response to the jury's note.

The jury recognized that there was insufficient evidence of an unauthorized

use of another's identity to support a guilty verdict, but was not provided the tools

with which to acquit Mr. Carter.  Accordingly, on these grounds Mr. Carter's motion

for a Judgment of Acquittal should be granted.

> ## II. The Evidence was not Sufficient to Support the Jury's Verdict that the Identifying Information Was the "Crux" of the Aggravated Identity Theft Charged in Count Three

The Court charged the jury that the Government had to prove beyond a

reasonable doubt that Mr. Carter used someone else's identification "during and in

relation to" the wire fraud conspiracy charged in Count One or the substantive wire

fraud charged in Count Two when the "use is at the crux of what makes that conduct

criminal."  The use "cannot merely be ancillary to what makes the conduct charged

in Counts One and Two fraudulent.  The identification must be used in a manner that

is fraudulent or deceptive.  Tr. at 1768.

---

[12] The letter appearing in stand-by counsel's file, with the proposed jury instruction, states that it was copied to AUSA Jeffrey Coffman "by ECF," but the letter does not appeal to be recorded on the docket.

The facts of this case are remarkably similar to those in *United States v. Dubin*, 599 U.S. 110 (2023), where the Government by charging aggravated identity theft "wielded" the statute "well beyond the ordinary understandings of identity theft." *Id.* at 115.  In *Dubin*, the defendant managed a psychological services company that submitted claims for Medicaid reimbursement by licensed psychologists when the services were in fact performed by mere "licensed psychological associates."  By claiming the services were performed by licensed psychologists, the defendant inflated the amount of the Medicaid claim.  Dubin was charged with health care fraud in violation of 18 U.S.C. § 1347, and aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1).  *Id.* at 114-115.  The Government argued that Dubin's was a clear case of aggravated identity theft because the false billing included the patient's Medicaid reimbursement number, *i.e.*, a "means of identification." *Id.* at 115.  The Government's view was that Dubin was guilty because any time another person's means of identification is employed in a way that facilitates a predicate crime, the conduct is "in relation to" that predicate crime and therefore aggravated identity theft has taken place.  The Court observed this formulation was far afield from the definition of identity theft, *id.* at 122, because the offense would "apply automatically any time a name or other means of identification happens to be part of the payment or billing method used in the commission of a long list of predicate offenses.  In other words, virtually all of the time." *Id.* at 117.   The Supreme Court held that in

order to support a guilty plea, there must be evidence that the use of the means of identification was at the crux of the criminality. *Id.* at 126.

> In other words, the means of identification specifically is a key mover in the criminality. This central role played by the means of identification, which serves to designate a specific person's identity, explains why we say that the "identity" itself has been stolen. This helps explain why the examples resulting from the Government's theory do not sound like identity theft. If a lawyer rounds up her hours from 2.9 to 3 and bills her client using his name, the name itself is not specifically a source of fraud; it only plays an ancillary role in the billing process. The same is true for the waiter who substitutes one cut of meat for another; we might say the filet mignon's identity was stolen, perhaps, but not the diner's.

*Id.* at 123. *See also United States v. Spears*, 729 F.3d 753, 756 (7th Cir. 2013) (*en banc*)  ("identity theft" occurs when someone's identity has been "*stolen or misappropriated"*) (emphasis added).  The jury's note in this case highlights the lack of evidence that the applicants' identities had been stolen or misappropriated.

Assuming for the sake of this motion that the Government proved beyond a reasonable doubt that Mr. Carter engaged in a wire fraud conspiracy or a substantive wire fraud in connection with his processing of applications for EIDL funds, the identity of the applicant was not material to the SBA's decision whether to grant the application.  The criteria were clearly spelled out on the application form, *e.g.*, the business had to be in operation as of January 30, 2020, it could not have more than 500 employees, and it could not engage in an illegal activity, gambling or lobbying. See GX 2.  The size of the grant was dependent on the number of employees.  Tr. at 512, 524, 1036-1037.  There is no evidence that the identification of the applicant

28

played any part in the SBA's decision making.  For example, while an applicant had to

supply his or her address, that applicant's geographic location was not a

consideration when approval decisions were made.  Thus, there was insufficient

evidence that Mr. Carter used any means of identification "in relation to" Counts One

or Two.

> **III.   Counts Two and Three Each Improperly Charged**
> **More than One Offense and Denied Mr. Carter**
> **his Constitutionally Protected Right to a**
> **Unanimous Jury**

"An indictment is impermissibly duplicitous where (1) it combines two or

more distinct crimes into one count in contravention of Rule 8(a)'s requirement that

there be a separate count for each offense, and (2) the defendant is prejudiced

thereby." *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001).  Duplicity,

however, is only a pleading rule and would in no event be fatal to the count where

the Government elects to proceed to trial on only specifically identified crimes and

the judge instructs the jury that they must "unanimously agree on the particular

conduct underlying the conviction." *United States v. Arguedas*, No. 20 Cr. 135 (JMF),

2021 WL 5567749 (S.D.N.Y. Nov. 29, 2021).  *See United States v. Droms*, 566 F.2d 361,

363 n.1 (2d Cir. 1977); *United States v. Nicolo*, 523 F. Supp.2d 303, 314 (W.D.N.Y.

2007), *aff'd*, 421 Fed. App'x 57 (2d Cir. 2011).

In this case, the Government argued that more than 1,000 applications – each

involving more than one wire communication – were fraudulent and violated the

wire fraud statute, but failed to identify with specificity which wire communications

formed the basis for Mr. Carter's conduct.  Despite instructing the jury multiple

times that its verdict must be unanimous, by failing to instruct the jury that it must

unanimously agree on which communication (if any) was fraudulent, Mr. Carter was

denied a unanimous jury verdict and therefore Counts Two and Three were

impermissibly duplicitous.

The general rule is that motions to dismiss on duplicity grounds are required

to be brought pretrial no doubt so that the Government has the opportunity to cure

the infirmity.  *See* Rule 12(b)(3)(B)(i), Fed. R. Crim. P.  The rule also provides that the

Court may excuse an untimely filing and consider the request "if the party shows

good cause."  Fed. R. Crim. P. 12(c)(3).  *See United States v. Simmons*, No. 08 Cr. 1280

(VEC), 2020 WL 6381805 at *4 (S.D.N.Y. Oct. 29, 2020 (collecting cases).

Mr. Carter's status as a pro se defendant is good cause. "A party appearing

without counsel is afforded extra leeway in meeting the procedural rules governing

litigation, and trial judges must make some effort to protect a party to appearing

from waiving a right to be heard because of his or her lack of legal knowledge."

*United States v. Forino*, No. 14 Cv. 979 (DJS), 2015 WL 13016006 at *2 (D. Conn.

Oct. 28, 2015).  *See Haines v. Kerner*, 404 U.S. 519, 520 (1972) (*per curiam*)

(allegations of *pro sec* complaint are held to less stringent standard than formal

pleading drafted by lawyers, when court considers a motion to dismiss); *United*

*States v. Thrower*, 584 F.3d 70, 72 n.1 (2d Cir. 2009) (accepting an untimely reply

brief filed by a *pro se* appellant as part of the appellate record for good cause as the

Court "gives *pro se* defendants wider latitude with procedural rules." *See also United States v. Okparaeke*, No. 17 Cr. 225 (NSR), 2019 WL 4233427 at *3 (S.D.N.Y. Sept. 6, 2019).

For the foregoing reasons, Counts Two and Three should be dismissed.

### IV. Mr. Carter Joins the Analyses and Arguments of His Co-defendants In their Motions for Judgments of Acquittal and for a New Trial

This motion supplements Mr. Carter's pro se motions raised during the trial and at the conclusion of the Government's case. Mr. Carter also joins the analyses an arguments of his co-defendants in their motions during the trial and their post-trial motions for judgment of acquittal and a new trial.

### CONCLUSION

For the foregoing reasons, this Court should: Dismiss Count Two as impermissibly duplicitous; dismiss Count Three as impermissibly duplicitous or enter a judgment of acquittal on Count Three because the evidence is not sufficient to support the verdict.

Dated:      White Plains, New York
            September 1, 2024

                            Respectfully submitted,

                            /s/   Jill R. Shellow
                            Jill R. Shellow
                            *Counsel for Jacob Carter*