# LAW OFFICES OF JILL R. SHELLOW PLLC

_____

15 Chester Avenue
White Plains, NY 10601
jrs@shellowlaw.com
212.792.4911  (Telephone)
203.258.1463  (Mobile)

February 13, 2025

**BY ECF AND BY HAND**
The Honorable Nelson S. Roman
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, NY  10601

> **RE:** ***United States v. Jacob Carter, 21-cr-681 (NSR)***

Dear Judge Roman:

This letter is submitted for Your Honor's consideration when you sentence Jacob Carter on February 27, 2025.

Mr. Carter is not the person who represented himself in the pretrial proceedings and at trial.  That person's writings appeared to be those of someone who has no respect for the United States Constitution, rule of law or courtroom decorum. That person's behavior and attitude toward the proceedings appeared to be that of a man who denies all government authority.  And that person appeared to disrespect the Court.  Nothing could be further from the truth.

The journey that led Mr. Carter to Your Honor's courtroom is not linear.  But by the same token it is not mysterious.  The goal of this sentencing memorandum is to explain the journey, introduce the real Mr. Carter to Your Honor, and justify why I am asking that Your Honor sentence Mr. Carter to a  total of 24 months in prison.  I recognize that this is a big "ask," but by the time Your Honor gets to the end of this

Admitted:  NY, CT, DC

**The Honorable Nelson S. Román**
**United States District Judge**
February 13, 2025
Page 2

submission, my hope is that I will have demonstrated why, even in the face of serious fraudulent conduct, 24 months is sufficient but not greater than necessary to achieve the goals of our criminal justice system.

The Presentence Report

The Probation Department calculated that the advisory Federal Sentencing Guideline is 135-168 months on the Indictment's fraud counts followed by 24 months for the aggravated identity theft.  The Probation Department's recommendation is that Your Honor vary downward to a total sentence of 84 months – 60 months for the fraud followed by 24 months for  the identity theft. *Id.*

The Probation Department interviewed Mr. Carter in March 2024 without the presence of counsel, and Mr. Carter did not have an opportunity to raise objections or request corrections before the Final Report, dated May 2, 2024, was filed.  Yesterday, we submitted to Your Honor and the Probation Department a request for extensive corrections to the PSR.

We respectfully urge Your Honor to view the Probation Department's recommendation as flawed because it relies on incorrect and incomplete information. For example, Mr. Carter never understood the importance of telling the Probation Officer that he fully accepts responsibility for his conduct (*see* Jacob Carter's letter to Your Honor in Exh. A), nor did the Probation Department know that after the PSR was filed, in September 2024, Mr. Carter literally saved the life of another inmate at MDC (*see* Special Act Acknowledgement memorandum from the MDC Warden and Certificate of Appreciation for Exemplary Pro-Social Behavior together in Exh. B.)  The

**The Honorable Nelson S. Román**
**United States District Judge**
February 13, 2025
Page 3

Probation Department recommendation was made without benefit of this information.

## The Journey

All journeys have a beginning, a middle and an end, and the path of a journey is usually told chronologically.  Mr. Carter's journey starts in Mount Vernon, where Mr. Carter grew up.  The middle is his exemplary military career followed by his fall into financial ruin (exacerbated by the pandemic).  The beginning of the end of Mr. Carter's journey is his arrest, the pretrial proceedings, the trial, the sentencing that is yet to come, and the life that Mr. Carter will lead when he is released from prison.

This memorandum tells the story of Mr. Carter's journey starting with Mr. Carter' arrest, trial and conviction in Your Honor's courtroom.   The story then goes back to the beginning – to Mount Vernon – to explain how Mr. Carter came to be in this place.[1]

Arrest, Trial and Conviction

Jacob Carter has no criminal history, nor does he have any significant personal experience with the consequences of rule-breaking.  When he was arrested, he began his legal education on the Internet.  As with all defendants who cannot afford counsel, at the initiation of these proceedings, counsel was appointed.  Unfortunately – as

---

[1] This memorandum gives an overview of Jacob Carter's social history.  A thorough recitation appears in the Mitigation Report, Feb. 13, 2025, prepared by Noah Friedman-Rudovsky at Exh. C.

**The Honorable Nelson S. Román**
**United States District Judge**
February 13, 2025
Page 4

sometimes happens – Jacob and his counsel were a bad fit.  Jacob felt that he and his lawyer were not able to communicate.  To make matters worse, no one ever advised Jacob that if he and his lawyer had insurmountable problems that the Court could appoint a new lawyer – someone with whom Jacob could hopefully develop a trusting relationship.  So, Jacob – believing that no one would protect his interests in the proceedings decided – even in the face of Your Honor's thorough allocution – to represent himself.  And Your Honor designated the appointed lawyer to be Jacob's stand-by counsel.

We have become accustomed to turning to our computers for answers when there is a fact we do not know, or a system we do not understand.  More often than not, we get helpful and reliable information.  Sometimes, however, an Internet search first spits out the wrong information.  And when we feel like the answer to our query will be life altering, we do not always scrutinize the Internet's response as carefully as we should.  Rather, we dig further into the wrong information, and fall headfirst down a rabbit hole.   When there is no one we trust to explain why the Internet was wrong and to help pull us out of the hole, we end up digging ourselves deeper and deeper into that hole.  That is what happened to Jacob Carter.

Jacob knew that he was in real trouble, but lacking a lawyer he could talk to, Jacob repeatedly turned to the Internet for advice on what to say and how to behave in the courtroom.[2]  For a variety of reasons, which will soon become clear, Jacob was

---

[2] The Internet serves as a primary source of information for untrained litigants, facilitating the spread of sovereign ideology through videos and flawed interpretations of the law.   Juris Blog, Duquesne Law School, JURIS MAGAZINE, Feb. 26, 2024 at https://sites.law.duq.edu/juris/2024/02/26/sovereign-citizens-deciphering-their-

**The Honorable Nelson S. Román**
**United States District Judge**
February 13, 2025
Page 5

particularly vulnerable to the conspiracy theories and mis-information he learned on the Internet. Relying on this faulty information, Jacob acted as those theories told him he should act and filed papers with language that those theories instructed him to use. Because Jacob didn't trust his stand-by counsel, he never consulted him about the propriety of proceeding in this manner. As a result, Jacob dug himself into a hole so deep that he could not see the light. That was the Mr. Carter that Your Honor came to know during the many pretrial conferences and nine trial days.

All that changed after Mr. Carter was convicted, and the undersigned was appointed. During my first couple of meetings with Jacob at the Westchester County Jail, I just listened. Occasionally, I would ask a question, but mostly I let him talk. Soon, Jacob came to the surprising realization that not all lawyers are alike. He saw that his new lawyer wanted to hear what he had to say and had the skills to listen. Jacob learned to trust me.

When Jacob was all talked out, the real Jacob Carter was revealed. The real Jacob Carter is smart and intense, committed to his family and his country, creative and inspiring, and Type A and stubborn – just to name a few of his positive and not-so-positive attributes. The more I learned about Jacob's journey, the more I am convinced that the person I met at the Westchester County jail is the real Jacob Carter, and that the Jacob Carter who appeared in Your Honor's courtroom was a Jacob Carter acting from a place of fear and isolation coupled with ignorance about the criminal

---

conspiracy-theories-and-strategies-for-productive-engagement-in-law/ (last visited Feb. 12, 2024) *citing* https://www.law.com/newyorklawjournal/2022/01/27/the-growing-danger-of-sovereign-citizens.

**The Honorable Nelson S. Román**
**United States District Judge**
February 13, 2025
Page 6

justice system.   The Jacob Carter who was present in Your Honor's courtroom appeared to be a defendant untethered to reality.[3]

Growing Up in Mount Vernon and
Attending Rye Country Day School

For all appearances, Jacob grew up in a stable low-middle income home with two parents who worked and four siblings in Mount Vernon.  He was neither the youngest, nor the oldest.  Jacob was closer to his mother than his father, but his emotional rock was Barbara Lloyd, his maternal grandmother.  They were especially close and when Jacob felt alone, needed to work through his feelings, or wanted the comfort and support of an adult, he turned to his grandmother.

Jacob's parents worked hard to provide the best possible future for Jacob and his siblings.  In his early school years, Jacob attended the Mount Vernon public elementary school.  When Jacob appeared to be struggling academically, his parents – with the help of generous scholarships – sent him to Rye Country Day School (RCDS) – one of the elite, private, co-ed prep schools in Westchester County.  Jacob's older brother was an RCDS student, and Jacob's parents hoped that the small class sizes and individualized attention would help Jacob overcome his academic weaknesses.  Jacob made them proud.  Jacob had a creative streak and was active in extra-curricular

---

[3] Before I met Jacob, I read some of the transcripts and pleadings that he had filed.  I was sufficiently concerned about Jacob's mental health, that I asked Your Honor to approve CJA funds for a psychiatric evaluation.  When Jacob indicated that he would fully cooperate with the evaluation, Your Honor appointed Eric Goldsmith, MD, a forensic psychiatrist.  Dr. Goldsmith concluded that Jacob did not evidence any major mental illness.  *See* Exh. D, Report of Eric Goldsmith, MD, Nov. 14, 2024.  Dr. Goldsmith's report is discussed in greater detail *infra*.

**The Honorable Nelson S. Román**
**United States District Judge**
February 13, 2025
Page 7

sports, but he mostly excelled in the structured learning environment of what we today call the STEM subjects.[4]

But all was not rosy at RCDS for Jacob.  RCDS is a pre-K to 12 school.  Most of its students started kindergarten together and graduated from 12th grade together. Jacob started at RCDS in third grade, so he came into the school as an outsider.  At the time RCDS had few students of color, and unlike his older brother who was a star athlete and a member of the "popular kids" group, Jacob was never accepted as a member of the "RCDS community" – one of the strengths of the school touted by its administration and alumni.  Jacob was always an "other."  Jacob's parents were not rich.  His clothes were from K-Mart, not Bloomingdales.  And while his classmates spent their summers at sleepaway camps, Jacob worked odd jobs and went to funerals of friends and family who were murdered on the streets of Mount Vernon.  At RCDS, Jacob learned how to compartmentalize his thoughts and his conduct.  His brain had one compartment for his school life at RCDS; another compartment for his life at home.  Jacob yearned to live in the former, but knowing that would always be beyond his reach, settled for the latter.

Jacob also endured the blatant racism pervasive in Rye in the 1990s and early 2000s.  Too many times, when Jacob was the driver or a passenger in a car with his brother or teenage friends, the police would pull them over for DWB – driving while black – for the fun of just harassing them.  Jacob's father says that these early experiences sowed the seeds of Jacob's distrust of law enforcement officers and other authority figures.

---

[4] STEM:  Science, Technology, Engineering and Mathematics.

**The Honorable Nelson S. Román**
**United States District Judge**
February 13, 2025
Page 8

When his RCDS classmates were traveling to visit colleges and applying to schools like Yale, Bennington, the University of Chicago, and Stanford, Jacob chose to enlist in the Air Force.  For one thing, he knew his parents could not afford more private school tuition payments.  For another, he knew that he would receive valuable training in the military and that one day the Air Force might even pay for him to go to college.  At the time, the reputation of the Air Force was that it was the branch of the service favored by white, upper class males and that as a result of forced efforts to diversify, smart men of color had greater promotion opportunities in the Air Force than the other armed services.

Jacob's Service in the Air Force and Subsequent
Employment in the Military-Industrial Complex

Jacob was at RCDS when the World Trade Center Towers fell, and with 9/11 still fresh in everyone's mind, Jacob's best friend, Kirk Williams, decided to enlist. Jacob followed Kirk's lead and was proud to serve his country.  Jacob also recognized that the military was ordered with the kind of structure in which he thrived.  Kirk enlisted in the Air Force and so did Jacob.  Jacob enlisted in September 2003 when he was a high school junior, and he began his service in September 2004 after he graduated from RCDS.

The Air Force trained Jacob in communications and antenna systems and anti-terrorism operations.  Jacob was stationed in Turkey and Germany during the U.S. Operation Iraqi Freedom in 2004 when the Air Force was providing, among other things, combat air patrols and search and rescue capabilities.  Jacob was not on the

**The Honorable Nelson S. Román**
**United States District Judge**
February 13, 2025
Page 9

front lines, but he performed support for a range of other missions classified as security, stability, transition, and reconstruction operations. Jacob relished the diversity of the Air Force and made life-long friends. But Jacob became disillusioned and distrustful when he learned that the military brass regularly withheld information from the troops and when he saw that U.S. troops were not universally welcomed in foreign countries.

Jacob was posted to Andrews Air Force Base in suburban Washington, D.C., in 2007, when Grandma Barbara died, and the next year when Jacob's mother was diagnosed with pancreatic cancer, Jacob decided to leave active duty and return home to be with his mother. That said, Jacob remained on inactive reserve status until 2012, when he received an Honorable Discharge and completed his service obligation.[5]

From 2008 to 2020, Jacob held communications-related positions with military contractors that included work on infrastructure, security, engineering software and geographic mapping projects, and he completed various training programs.[6] He held a security clearance that allowed him to work at the Pentagon and Andrews Air Force Base, and to perform maintenance on Air Force One.

---

[5] The Defense Department Certificate of Release Or Discharge from Active Duty (DD Form 214) includes a list of the medals Jacob earned and the military education he received. This form, a photo of Jacob's 2007 Award for Communications-Electronics Systems Outstanding Airman, and Jacob's Honorable Discharge Certificate are together in Exh. E.

[6] We were able to locate a few of the Air Force certificates for completed training, and they are grouped together in Exh. F.

The Honorable Nelson S. Román
United States District Judge
February 13, 2025
Page 10

One of Jacob's many tattoos says, "Brothers from another, ties like no other," which Jacob says reflects the relationships he built in the military. These relationships are reflected in the letters to Your Honor from people who knew him in the Air Force and worked with him in the years after.

- Christopher Henderson met Jacob when they were stationed together in Turkey. After Christopher received a medical discharge, he suffered from extreme depression that he hid from his family. Jacob found the time to talk to Christopher almost daily for three years. "He listened when I needed to vent, reassured me when I doubted myself, and encouraged me to be a better husband and father. His empathy and support helped pull me out of a very dark place, and I will forever be grateful for that." *See* Exh. G.

- Jacob met Colin Holley when they worked together for a military contractor. They started as colleagues. Then Jacob became Colin's team leader. Colin describes Jacob as one who "consistently demonstrates thoughtfulness toward others and places great importance on collaboration within a team." *See* Exh. H.

- Jose Rodriguez spent hours traveling with Jacob from Air Force base to Air Force Base conducting communications audits. During their time together, Jacob's dedication to helping young people find their way was the impetus for Jose to get involved in his community, and Jose became a Youth Soccer Coach. *See* Exh. I.

- Kirk Williams and Jacob were best friends growing up. They played football together, and Jacob

**The Honorable Nelson S. Román**
**United States District Judge**
February 13, 2025
Page 11

> followed Kirk into the Air Force.  Kirk is getting ready to retire, and as he reflects on the people he has relied on throughout his career, he wants Your Honor to know that "Jacob is one of those rare people whose selfless service, dedication to family and country, and unwavering reliability have always stood out."  The depths of Kirk's respect for Jacob is reflected in the statement, "I would not hesitate to serve alongside Jacob again if given the opportunity." *See* Exh. J.

Each of  these letter writers understands the seriousness of Jacob's conviction, but they want Your Honor to know that Jacob's conduct is an anomaly in an otherwise exemplary life and that Jacob is deserving of Your Honor's mercy.

Jacob's Commitment to His Family and the
Greater Community

Jacob learned to respect the value of family first from his parents who, as his father says, "raised him in a loving family atmosphere."  *See* Bishop Cass B. Carter Letter at Exh.  K.  And after his mother died, for seven years Jacob took it upon himself to provide a home for his disabled father.  Once his father moved into senior housing Jacob "made it a point to check on him every day to make sure he didn't need anything." *Id.*

Being a member of Jacob's family means knowing that he will always have your back.  His little sister, Joi, was only 15 when they lost their mother.  Their father was emotionally unavailable to help her grieve.   She writes that "Jacob made sure to remind me of all I could be and where I came from….. He encouraged me as I chased my dreams.  He took on more than he had to just to give me a chance at having a

**The Honorable Nelson S. Román**
**United States District Judge**
February 13, 2025
Page 12

decent life…. He never judged me for my mistakes, instead he offered me a safe place to stay when I had my daughter at the age of 20 and embraced her as one of his own." *See* Joi Frasier letter at  Exh. L.

Jheaneel Bailey is Jacob's wife and the mother of his four youngest children. They have been romantic partners for more than 20 years.  Her letter to Your Honor is a window into Jacob as a father.  Their children are courageous because "whenever faced with adversity or anything that could bring feelings of uncertainty within, Jacob would always tell them "Strong Heart, Strong Mind."  This reminded the children "to be steadfast and to know that they could and would overcome anything that may stand in their way."  *See* Exh. M.  Just like Jacob has imparted this lesson to their children, Jacob knows that if he is steadfast, he too can and will overcome the consequences of his conduct.

Audrey Bailey is Jheaneel's mother (Jacob's mother-in-law).  She writes to Your Honor about Jacob's selflessness, his inspiration, the way he "instills in his children the importance of family and community not only through his words and teachings but through actions."  *See* Exh. N. She talks about how when he is watching movies with his children he patiently explains the small nuances and lessons in the movie that they may have missed, and how he would "spend hours building Legos with the children never becoming frustrated always just calm."  *Id.*

Kadesja Thompson is almost a family member.  She is a long-time friend, the godmother to Jacob's children and a neighbor.  She recounts for Your Honor how Jacob during the pandemic started a fitness group for his neighbors to help "battle the

**The Honorable Nelson S. Román**
**United States District Judge**
February 13, 2025
Page 13

mental load that came along with losing loved ones" from COVID.  She adds that she does not know if she could have made it through such a hard time were it not for Jacob.  *See* Exh. O.

There is one letter to Your Honor that I hesitated to submit.  The letter is from Jacob's 12-year old daughter.  I have always shied away from submitting letters from young children fearing that a judge will think that the defendant has exerted unfair influence on the child so that the child becomes a protector of his or her patent.  Jacob was upset when I explained my views.  He pushed back hard at my explanation.  He wants Your Honor to hear from his daughter – in her own words – what their relationship means to her.  I acquiesced.  She knows that her father has done wrong, but she doesn't know the details.  She just knows that she, too, wants to share with you the person she calls her "superhero."  I am not going to quote from her letter, or attempt to paraphrase her thoughts.  Her letter speaks for itself.  *See* Exh. P.

The Road from Successful Engineer With a
Security Clearance to MDC Brooklyn

The pressures that led Jacob to prison started to build in 2016.  By then, Jacob and Jheaneel had two small children.  Jheaneel was having health problems and at the same time trying to get in shape to apply to the D.C. Police Academy.  Jacob decided that his priority had to be his family, and so he traded a job that paid him $35/hour (but required long absences from home) for a job that paid $16/hour (but allowed him to be close to home and share childcare duties).  The drop in their household income proved to be a significant strain.  Jacob and Jheaneel couldn't pay the mortgage, insurance, medical bills, Jacob's child support for his two oldest children, and still have money left for groceries.

The Honorable Nelson S. Román
United States District Judge
February 13, 2025
Page 14

The bills went unpaid, and by 2018, the bank foreclosed on their house. Jheaneel and the children moved in with Jheaneel's mother in New York, but Jacob was still working for $16/hour in Washington, D.C. Jacob made the trip back and forth between his work in D.C. and his family in New York, but because he could not afford an apartment or a hotel in D.C., he ended up essentially homeless – living in his car.

Jacob was ashamed of his circumstances. He put on a good face and compartmentalized this part of his life so that no one knew how desperate their financial situation had become. In 2019, for a brief time, things looked like they were getting better. Jacob found a better paying job that required him to be at Andrews Air Force base, but he couldn't make it last. By now Jheaneel was working as a D.C. police officer, her dream job, but Jacob and the children were living in New York with Jheaneel's mother who had taken ill. Once again, the commute between New York and suburban Maryland was too much, and by early 2020 Jacob had to quit work.

The pandemic was the crushing blow. Everything shut down in mid-March 2020. By May 2020, Jheaneel – a first responder and essential worker – was always working. The world Jacob knew had fallen apart. Jacob was no longer able to compartmentalize, and there were no structures to keep his dark thoughts at bay. By the spring of 2020, a different conspiracy theory was on the news each night: China intentionally engineered the virus to unleash it on the world; Anthony Fauci and Bill Gates were using their power to profit from a COVID-19 vaccine; wearing a mask activates your own virus. Jacob bought into these ideas and many more. And the SBA Economic Injury Disaster Loan (EIDL) program seemed to be a lifeline not only for

The Honorable Nelson S. Román
United States District Judge
February 13, 2025
Page 15

him, but for others he knew who were struggling under the weight of the quarantines and dead bodies.

In Dr. Goldsmith's opinion, Jacob had "developed longstanding feelings of mistrust, beliefs that the United States Government withholds information from its citizens and adopted many conspiracy theories. Jacob's gravitation towards these paranoid ideas stems from his experiences in life, including what he perceives was the loss of his grandmother and mother under suspicious circumstances and multiple experiences of feeling exploited by authority figures." *See* Exh. D.

Jacob viewed the EIDL program as an opportunity for him to do good for his community without anyone suffering. By processing EIDL applications for others, they would benefit and so would he. He did not think anything of lying on the forms because the money was going to people who needed it – himself included. The money he made allowed him to pay off the household bills and was an opportunity to have shiny things just like his peers at RCDS that Jacob couldn't resist.

We have reached that point where I can pick up the story of Jacob Carter's journey after his conviction and his remand. The Westchester County Jail in Valhalla restored the structure that Jacob needed, but not in the positive way that the structure of the Air Force had helped him grow and develop into an adult. Jacob chaffed in the confines of the jail walls, but he knew that one day it would end. Jacob Carter did not expect that the nightmare of Valhalla would give way to the inhumanity of MDC.

**The Honorable Nelson S. Román**
**United States District Judge**
February 13, 2025
Page 16

Conditions at MDC

Jacob did not know hell until he arrived at MDC on September 6, 2024 (his birthday). The conditions at MDC Brooklyn are deplorable – not fit for animals in zoos, much less human beings. Media attention abounds. *See, e.g., Concerns Grow over Safety of Incarcerated People at Metropolitan Detention Center in Brooklyn*, News12 Brooklyn, Jan. 21, 2025;[7] *Exclusive: Inmates Decry Conditions Inside Brooklyn Jail*, NY1.com, Jun. 24, 2024;[8] *Inmate at Brooklyn's Troubled Metropolitan Detention Center is Stabbed to Death: Sources*, N.Y. Daily News, June 20, 2024;[9] *Maggot-infested Meals Being Served to Inmates at Brooklyn Federal Jail, Lawyers Say*, N.Y. Daily News, Mar. 30, 2024.[10] *Compare* Animal Welfare Act of 1966, 7 U.S.C. § 2131 and T. Blackett, *Core Fundamental Standards of Practice for Captive Wild Animals*, Wild Welfare, Oct. 2020.[11]

---

[7] Available at https://brooklyn.news12.com/ concerns-grow-over-safety-of-incarcerated-people-at-metropolitan-detention-center-in-brooklyn (last visited Feb. 12, 2025)

[8] Available at https://ny1.com/nyc/all-boroughs/politics/2024/06/24/brooklyn-federal-jail-murder-conditions (last visited Jul. 4, 2024).

[9] Available at https://www.nydailynews.com/2024/06/20/inmate-at-brooklyns-troubled-metropolitan-detention-center-is-stabbed-to-death-sources/ (last visited Jul. 4, 2024).

[10] Available at https://www.nydailynews.com/2024/03/30/maggot-infested-meals-being-served-inmates-at-brooklyn-federal-jail-lawyers-say/ (last visited Jul. 4, 2024).

[11] Available at https://wildwelfare.org/wp-content/uploads/Core-Fundamental-Standard-of-Practice-for-Captive-Wild-Animals-Oct2020.pdf (last visited Jul. 5, 2024).

The Honorable Nelson S. Román
United States District Judge
February 13, 2025
Page 17

I know that it is unnecessary to educate Your Honor and quote extensively from the many judicial opinions addressing the conditions at MDC, but I find myself unable to choose the among the most salient points from the opinion of the Honorable Jesse M. Furman in *United States v. Chavez*, 710 F.Supp.3d 227, 233-246 (S.D.N.Y. 2024). Judge Furman wrote:

> The conditions at the MDC are dreadful in many respects, but three warrant particular emphasis. First, inmates at the MDC spend an inordinate amount of time on "lockdown" — that is, locked in their cells, prohibited from leaving for visits, calls, showers, classes, or exercise. (In Orwellian fashion, the Bureau of Prisons does not refer to these periods as "lockdowns"; instead, it refers to them as "modified operations.") But there is no mistaking what the practice entails.
>
> Second, the MDC is notoriously and, in some instances, egregiously slow in providing necessary medical and mental health treatment to inmates…. It has become common for defense counsel to require court intervention to ensure that inmates receive basic care — and, even more shocking, not uncommon for court orders to go unheeded.
>
> Finally, the MDC's physical conditions have long been problematic. *See generally* Order, *United States v. Espinal*, No. 11-CR-537 (JMA) (CLP) (E.D.N.Y. Oct. 17, 2016), ECF No. 39 (collecting "letters relating to the conditions at the Metropolitan Detention Center," which reported visible mold on walls and ceilings, contaminated drinking water, vermin infestation, mouse droppings falling through HVAC vents, and roaches and flies in showers); *see also* John Marzulli, *Judge Refuses to Send Women to Brooklyn Jail with "Third World" Conditions*, N.Y. Daily News (Oct. 7, 2016), *available at* https://www.nydailynews.com / 2016/10/07/exclusive-judge-refuses-to-send-women-to-

**The Honorable Nelson S. Román**
**United States District Judge**
February 13, 2025
Page 18

> brooklyn-jail-with-third-world-conditions.     ....     More recently, the Court was advised that many, if not most, of the emergency call buttons in the MDC's main building are not working — even though those buttons are the only way (other than yelling and banging) to call an officer in emergency situations during a lockdown.

In *United States v. Parish*, No. 13 CR. 829 (AT), 2024 WL 3904626, at *5-6 (S.D.N.Y. Aug. 22, 2024), the Honorable Analisa Torres wrote:

> Courts in this Circuit recognize that the harsh conditions of confinement at the area's jails counsel in favor of a shorter overall sentence. ... The conditions at the area's jails make time spent there "essentially the equivalent of either time and a half or two times what would ordinarily be served." United States v. *Gonzalez,* 18 Cr. 669 (JPO), ECF No. 250 at 17:18–18:3. Such time is "materially different than time served at a jail or prison elsewhere in the United States."

And in *United States v. Colucci*, No. 23-CR-417, 2024 WL 3643857, at *7 (E.D.N.Y. Aug. 4, 2024) the Honorable Gary Brown sentenced a defendant to a nine month prison term with the specific caveat that if the BOP designated MDC as the relevant facility, then the imposed term of imprisonment would be vacated and, in its place, the defendant would serve nine months of home incarceration with electronic monitoring.

But you do not need to rely on the accounts of Judges.  Jacob catalogued some of the conditions that he personally experienced in contemporaneous notes. Following are a few examples:  He was locked down from September 12-15, 2024 for various reasons including an inmate stabbing and a malfunctioning elevator.  From October 25-28 there was no hot water, and no water at all on October 29.  (When

**The Honorable Nelson S. Román**
**United States District Judge**
February 13, 2025
Page 19

there is no water that means not only nothing to drink and no showers, but no working toilets.) He was locked down from October 28 to November 2. Jacob's unit flooded at least four times, and starting on December 16, 2024 through at least January 16, 2025 the air vents were pushing out frigid air day and night. *See* Exh. Q.

Through it all, Jacob held down a job as a unit orderly. Jacob's supervisor wrote in Jacob's Work Performance Rating for the period September 14-December 25, 2024:

> Inmate Carter is an outstanding orderly. Inmate Carter performs his duties with little to no supervision. Inmate Carter assists other inmates in their duties in addition to his own. Inmate Carter is an outstanding orderly who works well with others. He is well organized, dependable, timely, and always brings a positive attitude to his work."

*See* Exh. R. Jacob also managed to complete several programs, including three addressing money management. His certificates are gathered in Exh. S.

One incident stands out not only because of what it says about MDC, but more importantly what it says about Jacob. On September 30, 2024, an elderly inmate attempted to commit suicide by hanging himself with a bedsheet from the 2nd floor (the top tier). Jacob ran up the stairs from the lower tier and with another inmate pulled the person off the railing, freed his neck from the noose that he had fashioned, and escorted him to the corrections officers. Raul Maldonado, Jr., MDC's Warden at the time, acknowledged Jacob's intervention in a "Special Act Acknowledgement" memorandum and MDC gave Jacob a Certificate of Appreciation for "Exemplary Pro-Social Behavior." *See* Exh. B.

**The Honorable Nelson S. Román**
**United States District Judge**
February 13, 2025
Page 20

The Journey's Future:  Redemption

On April 27, 2024, before I was appointed to represent Jacob, he wrote a letter to Your Honor.  It is unchanged and appears in Exh. A.  In the letter Jacob writes,

> I sincerely take responsibility for my actions regarding the charges I was found guilty of by a jury of my peers within your court on February 9, 2024.
>
> ***
>
> The first steps to redemption are always accountability and acceptance of one's past transgressions.  Whatever time and fate sentenced, once released I plan to see my 6 children and explain to them my departure and absence as well as how my poor judgment and choice undoubtedly took away the most precious thing a father can give his children, loving time spent together.  Once released, I also plan to use my skills in art, technology, and engineering and public speaking to return to volunteering and running a program with pre-K through middle school students to make sure they all learn to organize, articulate and mobilize their thoughts and feelings in the most creating and constructive ways via blockchain tech, drones, drawing and building, but also learn from my mistakes of how a bad choice can forever not only change your life, but those lives of the ones we love most.

Inmates often make promises to Judges about what they will do once released, but sadly these promises are too often empty.  Jacob has proved he is not one of those defendants.  Many of the letters talk about his book, "Who Am I."  The book is reproduced in Exh. T.  "Who Am I" aims to instill in young Black students the pride that he never had.  This is not Jacob's only book.  Prior to his arrest, Jacob was working on several titles, including "Little Black Girl, They Envy Your Soul" (artwork and

**The Honorable Nelson S. Román**
**United States District Judge**
February 13, 2025
Page 21

layout concept created in 2016; artwork not completed) and "Invest in Thyself" (written in 2017 artwork and layout concept created in 2018-2019).

Since his arrest, Jacob has been working on –

"The Canopy of Connectivity" (rough draft, written in 2024, needs editing, layout formatting and fact checking as well as source citing before finalized);

"The Almighty Brothers" (characters created in 2019 into 2020. Origin story for characters created in 2024, artwork started in 2024 not complete);

"From Seed to Sequoia" (written in 2024, artwork started in 2024 not complete); and

"Who's Babysitting Who?" (written in 2024, artwork stated in 2024 not complete)

Jacob was reluctant to share his work-in-progress with me, but if you want to see these writings, I can provide copies. His writings are proof that he has a vision that he can and will pursue when he is released from prison.

## Conclusion

Jacob knows he made a serious mistake. He accepts responsibility for his actions. He acknowledges how the conviction will forever change his life going forward.

The sentencing statute requires that Your Honor impose a sentence on Jacob that is "sufficient but not greater than necessary" after considering, among other things, the nature and circumstances of the offense and the history and characteristics

**The Honorable Nelson S. Román**
**United States District Judge**
February 13, 2025
Page 22

of the defendant; the need to promote respect for the law and provide just punishment; both specific and general deterrence; the need to avoid unwarranted sentence disparities; and the advisory Federal Sentencing Guidelines. The aggravated identity theft statute requires Your Honor to impose 24 months in prison to follow the service of any other sentence.

The story of Jacob's journey, from Mount Vernon to redemption, demonstrates that a sentence of 24 months is sufficient but not greater than necessary.

Respectfully submitted,

Jill R. Shellow

cc:    All Counsel (ECF)
       Jacob Carter (by legal mail)